# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

CASE NO. 15-24454-JLK

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER
FOR AMTRUST BANK,

    Plaintiff,

v.

FIDELITY NATIONAL TITLE
INSURANCE COMPANY,
a Florida corporation,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the Court upon the parties' cross motions for summary judgment, both filed on May 8, 2017. DE 38 (Defendant's Motion); DE 39 (Plaintiff's Motion). The Court has additionally considered the parties' Responses, each filed on May 22, 2017, their Replies thereto, filed on May 30, 2017, and their respective statements of material facts. Upon review of the record and careful consideration, the Court finds that summary judgment should be granted in favor of the Defendant.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an insurance dispute between Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as receiver of AmTrust Bank, and its title insurer, Defendant Fidelity National Title Insurance Company. In 2008, Defendant issued Closing Protection Letters to AmTrust Bank with respect to two loans. Pursuant to the Closing Protection Letters, Defendant agreed to indemnify AmTrust Bank for any losses arising out of (1) the closing agent's failure to comply with the bank's closing instructions or (2) any fraud or dishonesty by the closing agent in handling the bank's funds or documents. DE 37-27. The Closing Protection Letters further provide that any claims must be received by the insurer "within ninety (90) days from the date of discovery of such loss." DE 37-27.

Relevant here, the bank's closing instructions provide that the closing agent must (1) alert the bank as to facts that might affect the bank's decision to make the loan, such as facts indicating that funds are being contributed by someone other than the borrower, (2) notify the bank if there is reason to believe there is fraudulent activity, and, if so, suspend the closing immediately, (3) suspend the closing if there is knowledge or reason to believe that any down payment money is not from the borrower's own funds or a bona fide gift, (4) only accept funds from accounts that have been disclosed to the bank, and (5) suspend the closing and notify the bank if

2

there is knowledge that the parties to the transaction made a material misstatement or discovers a falsehood before, during, or after closing. DE 40-7 at 1-4.

In its Motion for Summary Judgment, Plaintiff FDIC contends that Defendant wrongfully denied two valid claims under the Closing Protection Letters for violation of the bank's closing instructions. In its cross motion, Defendant counters that Plaintiff is barred from asserting the present action because Plaintiff's claims under the Closing Protection Letters were untimely. The Court will address the circumstances surrounding each claim in turn.

## A. The Fraudulent Loans

### 1. The Silva Loan

With respect to the first loan, Plaintiff alleges that the closing instructions were violated when the closing agent failed to collect the down payment from the borrower prior to the disbursement of the loan.

On November 18, 2008, the closing agent approved a $147,298.53 mortgage loan to Giselle Silva, and the loan was disbursed to the property seller the same day. DE 40-11. The next day, on November 19, the seller wired $106,125 to a company called New Life Import and Export. DE 40-16. New Life then wrote three checks to a man named Urias Assis which totaled to $73,689.69, and additionally wrote a $10,000 check to Silva. DE 40-17, 40-16. Later that day, Assis purchased a cashier's check on behalf of Silva for the amount required for the down payment ($73,689.69). This

3

sham check, which was issued two days after the loan was disbursed, was ultimately the source of Silva's down payment. Therefore, it is undisputed that the funding of the down payment was a result of a fraudulent straw buyer scheme between the seller and Silva.[1]

Silva defaulted on the loan after making only two payments. DE 40-26; DE 37-17 at 8. On July 13, 2009, AmTrust Bank initiated a foreclosure action against Silva. DE 37-22.

A year later, in November 2009, the Silva loan was referred to the bank's quality control department for auditing pursuant to the bank's standard procedure for early defaults. DE 37-16. On March 2, 2010, the auditor concluded that there was misrepresentation by the borrower based on findings that (1) the property was vacant even though the borrower listed it as her primary residence, (2) the borrower's loans contained significant gift funds from extended family members, (3) the gift funds contained identical letters and handwriting, although purportedly from different family members, (4) the instant loan purportedly contained a "gift" from an uncle, but investigation revealed that the "uncle" donor was in fact not related to the borrower, and (5) the borrower had multiple residences in a short period of time (under one year). DE 37-17 at 8.

---

[1] A straw buyer is a person who obtains a loan without intent to own or occupy it in order to facilitate a fraudulent transaction for a principal buyer who could otherwise not participate in the transaction. *See* STRAW MAN, BLACK'S LAW DICTIONARY (9th ed. 2009).

4

On December 4, 2009, AmTrust Bank failed and went into the receivership of Plaintiff FDIC. Plaintiff FDIC, stepping into the shoes of AmTrust, continued to pursue foreclosure of the Silva property, and a Final Judgment of Foreclosure was entered against Silva on December 9, 2013. DE 37-23. On April 15, 2014, the property was sold to a third party at a financial loss to Plaintiff.[2] DE 37-25; DE 40-1.

Notwithstanding the results of the March 2010 audit verifying the borrower's misrepresentation and the loss incurred during the April 2014 sale of the foreclosed property, Plaintiff did not report a claim for loss to the Defendant insurer at this time. Instead, Plaintiff claims that it did not discover its loss until January 2015, when it received records of the loan pursuant to an administrative subpoena. Specifically, as part of a large scale investigation of defaulted loans, on December 20, 2014, Plaintiff used its administrative subpoena power to serve a subpoena *duces tecum* to Bank of America to obtain the bank records of the Silva loan. DE 40-33. The records were produced to Plaintiff on January 13, 2015. DE 40-34. After reviewing the subpoenaed documents, on January 20, 2015, Plaintiff sent a claim letter to Defendants for coverage of the loss associated with the Silva transaction. DE 40-37. The claim was denied.

---

[2] The Silva property was sold to a third party for $140,000, which is well below the unpaid $283,555.56 principal balance of the loan. DE 37-25; DE 40-28.

## 2. The de Souza Loan

With respect to the second loan, Plaintiff alleges that the closing instructions were violated because the closing agent approved disbursement of the loan even though the down payment contained funds that were not the borrower's.

On September 19, 2008, the closing agent approved a $196,720 mortgage loan to Claudia de Souza, and the loan amount was disbursed to the property seller. DE 40-21. An HUD-1 form[3] completed by Defendant's approved title company falsely indicated that $62,202.78 was collected in cash from de Souza as a down payment to secure the loan. DE 40-6. However, the record indicates that de Souza's account balance at the time of the sale was not sufficient to make the required down payment. Instead, in violation of the closing instructions, the closing agent accepted the down payment funds from American Financial Solutions, LLC, a company involved in a fraudulent straw buyer scheme. DE 40-23; DE 40-25 at 7-8.

Prior to receiving notice of de Souza's misrepresentation, AmTrust Bank sold the de Souza note to the Federal Home Loan Mortgage Corporation ("Freddie Mac"). DE 37-2; DE 37-3. De Souza defaulted after failing to make a single payment on the loan. DE 37-3.

On August 11, 2009, Freddie Mac sent AmTrust Bank a repurchase demand and an accompanying letter, wherein Freddie Mac informed AmTrust that de Souza

---

[3] An HUD-1 form "is the uniform settlement statement mandated by the Real Estate Settlement Procedures Act in all transactions involving loans by federally insured banks." *FDIC v. Attorneys' Title Ins. Fund, Inc.*, No. 12-23599-CIV, 2014 WL 4384270, at *2 (S.D. Fla. Sept. 3, 2014) (Seitz, J.) (citing 12 U.S.C. § 2601 *et seq*).

had misrepresented her account information. Namely, Freddie Mac verified that de Souza's account only contained $307 at the time of closing, falling far short of the $62,202.78 required as down payment. DE 37-6; DE 37-4. The Freddie Mac letter further verified that the social security number listed by de Souza was false. Accordingly, Freddie Mac concluded that the quality of the loan was not acceptable and demanded that AmTrust Bank repurchase it. DE 37-4. The repurchase was approved by AmTrust on September 17, 2009. DE 37-6.

On February 2, 2009, AmTrust Bank commenced foreclosure proceedings against de Souza. DE 37-9. Meanwhile, as we know, AmTrust Bank failed and was placed into the receivership of Plaintiff FDIC in December 2009. A Final Judgment of Foreclosure was entered on August 22, 2013. DE 37-10. The de Souza property was later sold to a third party at a financial loss to Plaintiff on April 22, 2014. DE 37-12.[4]

Although Plaintiff had been alerted to the borrower's misrepresented account information in September 2009[5] and had experienced a loss from the property sale in April 2014, Plaintiff failed to report a claim to the Defendant insurer at this time. As it had done with the Silva loan, Plaintiff used its administrative subpoena power to obtain the de Souza bank records from Sabadell United Bank on January 20, 2015. DE

---

[4] The property was sold for $65,000, which was far short of de Souza's unpaid $196,720 principal balance. DE 37-12; DE 40-31.

[5] The Director of Fraud and Claims at the Mortgage Recovery Law Group, which investigates loans on behalf of the Plaintiff, confirmed that the repurchase demand was maintained at AmTrust Bank as a business record, and further confirmed that the bank was aware that the borrower's account statements were not accurate when it received the repurchase demand in 2009. DE 37-5 at 16.

40-35. The records were produced to Plaintiff on February 2, 2015. DE 40-36. Finally, on February 12, 2015, Plaintiff sent a claim letter to Defendant for the loss associated with the de Souza loan. DE 40-38. The claim was denied.

### B. The Instant Lawsuit

Plaintiffs filed the instant suit against Defendants for breach of contract on December 3, 2015. Before the Court are the parties' cross motions for Summary Judgment. In its Motion, Defendant primarily argues that the claims were untimely under the 90-day notice provision. In response, Plaintiff concedes that it was aware of the borrower's fraudulent conduct years prior to filing the claim, but asserts that the 90-day notice period did not begin to run until it discovered, through the subpoenaed documents, that the closing agents were personally involved in the fraud. The matter has been fully briefed, making the motions ripe for this Court's review.

## LEGAL STANDARD

"Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy[,] and inexpensive determination of every action." *Pace v. Capobianco*, 283 F.3d 1275, 1284 (11th Cir.

2002). Summary judgment is appropriate unless there is a genuine issue of fact for trial. *Agee v. Porter*, 216 F. App'x 837, 840 (11th Cir. 2007). "For factual issues to be considered genuine, they must have a real basis in the record." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). In opposing a motion for summary judgment, the nonmoving party "must show specific facts to support that there is a genuine dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not rely on the pleadings, but rather must demonstrate a genuine issue for trial through affidavits, depositions, interrogatory answers, and admissions. *Celotex*, 477 U.S. at 323-24. The existence of a "mere scintilla" of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the finder of fact could reasonably find for the moving party. *Nat'l Cas. Co. v. Pickens*, 582 F. App'x 839, 840-41 (11th Cir. 2014) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## DISCUSSION

Based on the record evidence, there is no dispute that the claims arising under the Closing Protection Letters were subject to a limitation period under which Plaintiff was required report losses to the Defendant insurer "within ninety (90) days from the date of discovery of such loss." DE 37-27. This 90-day period serves as a "bright line," meaning that any prejudice that Plaintiff may have suffered outside of the limitation period is irrelevant. *FDIC v. Attorneys' Title Ins. Fund, Inc.*, No. 12-23599-

9

CIV, 2014 WL 4384270, at *6 (S.D. Fla. Sept. 3, 2014) (Seitz, J.). Further, "an insured must have discovered *both* actual loss and the facts giving rise to a potential claim in order to start the 90 day clock for notifying the insurer of the claim under the [Closing Protection Letter]." *F.D.I.C. v. Stewart Title Guar. Co.*, No. 12-10062-CV, 2013 WL 1891307, at *6 (S.D. Fla. May 6, 2013) (King, J.). The central issue before the Court, therefore, is whether Plaintiff submitted its claims to Defendant within the 90-day notice period.

In the instant case, Plaintiff urges the Court to hold, as the undersigned did in *F.D.I.C. v. Stewart Title Guaranty Company*, that the 90-day notice period did not begin to run until it received the administratively subpoenaed bank documents. Specifically, Plaintiff contends that, without knowledge that the closing agents were involved in the fraud, Plaintiff could not have known that the loss was covered because the Closing Protection Letters only covered conduct by the closing agents, not by the borrowers. This, however, was not the holding in *Stewart*.

In *Stewart*, the only facts that the plaintiffs were aware of prior to receiving the subpoenaed documents were (1) that the borrowers had defaulted, and (2) that foreclosure proceedings had commenced. Notably, there were no facts in *Stewart* that would have alerted the plaintiff to potential claim coverage prior to its receipt of the subpoenaed documents. Accordingly, the undersigned held that where the plaintiff had no prior opportunity to be noticed of a potential claim, the clock did not begin to

run until its receipt of the subpoenaed bank records. Such a holding does not preclude title insurers from rightfully asserting a violation of the 90-day notice period where, as here, the plaintiff had notice of a potential claim far before receiving the subpoenaed records. Indeed, the facts in the instant matter are clearly distinguishable from those in the *Stewart* case.

The Court finds the facts in *FDIC v. Chicago Title Insurance Company*, 137 F. Supp. 3d 1331, 1332 (S.D. Fla. 2015) (affirming R&R) (Moreno, J.) to be more akin to this matter. That case involved the same Plaintiff and notice provision as those presently before the undersigned. As in the instant case, the parties filed cross motions for summary judgment, wherein the primary issue was whether Plaintiff timely filed its claim for losses within the 90-day time period. There, the closing instructions were violated when the closing agent accepted a down payment with funds that were not the borrower's. As here, the plaintiff argued that, although the bank was previously notified that the borrower had committed fraud, plaintiff could not have known that there was misconduct by the closing agent until after it had received its administratively subpoenaed documents. The defendant countered that Plaintiff only need be aware of facts giving rise to a *potential* claim. The defendant further argued that the following facts were sufficient to alert the plaintiff to a potential claim: (1) the borrower defaulted without making a single payment, (2) the borrower and the borrower's attorney notified the bank that the loan was fraudulent, (3) there were

inconsistencies in the HUD-1 form, and (4) that the property was foreclosed upon and sold at a loss to the plaintiff.

After careful review of a Report and Recommendation by Magistrate Judge John J. O'Sullivan, as well as a thorough analysis of the law, the Honorable Judge Federico A. Moreno ultimately concluded that "the appropriate standard appears to be one that triggers the notice provision when the lender discovers 'facts giving rise to *potential* coverage.'" *Chicago Title Ins. Co.*, 137 F. Supp. 3d at 1336 (quoting *Stewart Title Guar. Co.*, 2013 WL 1891307). Accordingly, Judge Moreno found that the facts alerting the FDIC to the borrower's fraud were sufficient to trigger discovery of a potential claim under the 90-day notice provision. Judge Moreno further noted that there is no "scienter element for the failure to follow a closing instruction provision." *Id.* at 1338 (quoting *Attorneys' Title Ins. Fund, Inc.*, 2014 WL 4384270, at *7). In other words, any document showing a violation of the closing instructions triggers a claim, regardless of whether the closing agent was aware of the violation at the time. *Id.* Judge Moreno further reasoned that the "potential claim" standard is founded on sound policy in the lending and title insurance industry:

> There are good policy reasons for this rule. In many situations (including in this case), it takes years for lenders to acquire specific proof of a closing instruction violation. Thus, if a lender's obligation to provide notice to a title insurer of a claim is only triggered when the lender has specific proof of an actual closing instruction violation, then title insurers would remain unaware of potential claims, thereby defeating the purpose of a closing protection letter's timely notice provision. Without timely notice, title insurers cannot take steps to investigate the potential

12

> claim—a job title insurers are more suited for than lenders anyway—and
> mitigate their potential loss. The appropriate standard to be applied,
> therefore, is whether IndyMac and the FDIC were in possession of facts
> giving rise to a potential claim under the Closing Protection Letter . . . .

*Id.* at 1336–37.

Therefore, in adopting the "potential claim" standard that has consistently been used by district court judges in the Southern District of Florida, the Court finds that Plaintiff was alerted to facts which gave rise to a potential claim prior to its receipt of the subpoenaed documents. *See, e.g., Chicago Title Ins. Co.*, 137 F. Supp. 3d at 1335; *Stewart Title Guar. Co* 2013 WL 1891307, at *5; *F.D.I.C. v. Attorneys' Title Ins. Fund*, No 1:10–CV–21197–PCH, D.E. 164 at 11 (S.D. Fla. May 17, 2011) (Huck, J.). With respect to the Silva loan, Plaintiff was alerted to facts giving rise to a potential claim beginning in November 2009 when Plaintiff's predecessor received the audit results verifying that the property was vacant, she had multiple short term residences, suspicious gift funds had been used, and her listed employers were nonexistent. As to the de Souza loan, Plaintiff had notice of a potential loss in August 2009 when Freddie Mac sent the repurchase demand verifying that the borrower had misrepresented her assets and did not have enough money in her account to make the down payment.

Of course, it is not enough that Plaintiff be aware of a potential claim. As the undersigned held in *Stewart*, the notice period is triggered only when Plaintiff has discovered both a potential claim *and* its actual losses. Here, at the very latest,

13

Plaintiff became aware of its actual losses when the foreclosed properties were sold in April 2014 for purchase amounts that were far below the borrowers' outstanding loan balances. Yet, Plaintiff did not submit its claim for the losses associated with the Silva loan until January 13, 2015, nor did it submit a claim for the de Souza loan until February 12, 2015. Clearly, both dates fall outside of the contractual 90-day notice period.

Accordingly, after careful consideration of the law in this district, the Court finds that Plaintiff's claims were untimely, and summary judgment must be awarded in favor of the Defendants.

## CONCLUSION

It is **ORDERED, ADJUDGED,** and **DECREED** that Defendant's Motion for Summary Judgment **(DE 38)**, be, and the same is, hereby **GRANTED**. It is further **ORDERED, ADJUDGED, and DECREED** that Plaintiff's Cross Motion for Summary Judgment **(DE 39)**, be, and the same is, hereby **DENIED**.

By separate Order, the Court shall enter Final Judgment on behalf of Defendant and against Plaintiffs.

**DONE** and **ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, this 23rd day of June, 2017.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

Cc: All counsel of record